# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**1170**

**CA 12-01605**

PRESENT: SCUDDER, P.J., FAHEY, PERADOTTO, LINDLEY, AND VALENTINO, JJ.

---

IN THE MATTER OF THE ESTATE OF ROBYN R. LEWIS,
DECEASED.
------------------------------------------------
JAMES ROBERT SIMMONS, PETITIONER-RESPONDENT;

OPINION AND ORDER

MEREDITH M. STEWART, RONALD L. LEWIS, RONALD L.
LEWIS, II, AND JONATHAN K. LEWIS,
OBJECTANTS-APPELLANTS.
(APPEAL NO. 1.)

---

WITTENBURG LAW FIRM, LLC, SYRACUSE, D.J. & J.A. CIRANDO, ESQS.
(ELIZABETH deV. MOELLER OF COUNSEL), FOR OBJECTANTS-APPELLANTS.

MENTER, RUDIN & TRIVELPIECE, P.C., SYRACUSE (JULIAN B. MODESTI OF
COUNSEL), FOR PETITIONER-RESPONDENT.

---

Appeal from a decree of the Surrogate's Court, Jefferson County
(Peter A. Schwerzmann, S.), entered May 18, 2012. The decree
dismissed the objections to the petition for probate and admitted to
probate the last will and testament of Robyn R. Lewis, deceased,
executed July 15, 1996.

It is hereby ORDERED that the decree so appealed from is affirmed
without costs.

Opinion by SCUDDER, P.J.:

I

Robyn R. Lewis (decedent) was married to James A. Simmons (ex-
husband), and they divorced in 2007. The parties resided in Texas
during the course of the marriage, but they purchased property in
Clayton, New York. Pursuant to the divorce decree entered in the
State of Texas, decedent was awarded, inter alia, the real property
located in Clayton. Decedent relocated permanently to that residence,
and she lived there until her death in March 2010. Following
decedent's death, her parents applied for letters of administration,
and amended letters of administration were issued in May 2010.
Decedent's parents thereafter renounced their interest in the Clayton
property so that it would pass to decedent's brother and half-brother.

In December 2010, petitioner, who is the father of the ex-
husband, filed a petition to probate a will of decedent dated July 15,
1996 and executed in the State of Texas (1996 Will). Pursuant to the

1996 Will, decedent appointed the ex-husband, who at that time was still married to her, as executor of the will and beneficiary of all of her property.  Also pursuant to the 1996 Will, in the event that the ex-husband predeceased decedent, petitioner was named as alternate executor and alternate beneficiary.  In his petition to probate the 1996 Will, petitioner alleged that the testamentary disposition to the ex-husband, as well as his appointment as executor, were revoked by virtue of the divorce (*see generally* EPTL 5-1.4 [a] [1], [3]).  Petitioner further alleged that he was the sole beneficiary of the 1996 Will, and asked Surrogate's Court to issue letters testamentary to him.  At the time petitioner filed the petition to probate the 1996 Will, he filed an additional petition seeking, inter alia, revocation of the amended letters of administration issued to decedent's parents.

Decedent's parents, brother and half-brother (collectively, objectants) filed objections to probate.  They contended that, inasmuch as decedent was a domiciliary of Texas at the time the 1996 Will was executed as well as at the time of her divorce, the nomination of petitioner as the alternate executor and alternate beneficiary failed under the Texas Probate Code.  Pursuant to section 69 (b) of that Code, "[i]f, after making a will, the testator's marriage is dissolved . . . by divorce . . . , all provisions in the will, including all fiduciary appointments, shall be read as if the former spouse and *each relative of the former spouse who is not a relative of the testator* failed to survive the testator, unless the will expressly provides otherwise" (emphasis added).  Objectants further contended that, because the divorce decree required the ex-husband to return any "paperwork associated with any items of the decree," his failure to return the 1996 Will to decedent wrongfully and fraudulently deprived decedent of the opportunity to access and evaluate the 1996 Will.  As a result, objectants contended that petitioner was "estopped from claiming any benefit or nomination from the late offering" of the 1996 Will.

In supplemental objections, objectants contended that the 1996 Will was "revoked by the revocatory language and content of a Second and Lost Will" executed by decedent (Lost Will).  Following a hearing, the Surrogate issued the decree in appeal No. 1, which dismissed all objections to the petition for probate and admitted the 1996 Will to probate.  The Surrogate further issued the decree in appeal No. 2, which revoked the amended letters of administration to decedent's parents and issued letters testamentary to petitioner.  We conclude that the decree in each appeal should be affirmed.

II

We note as a preliminary matter that our dissenting colleague would reverse primarily based on her conclusion that, because petitioner failed to account for all of the alleged copies of the 1996 Will, he failed to rebut the presumption that the 1996 Will was revoked by an act of destruction performed by decedent (*see* EPTL 3-4.1 [a] [2] [A]).  Objectants have never contended, however, that the 1996 Will was revoked by destruction.  Aside from challenges to the testamentary dispositions in the 1996 Will, the only other contention

raised by objectants is that the 1996 Will was revoked by the purported execution of the Lost Will (*see generally* EPTL 3-4.1 [a] [1] [A], [B]).

It is well settled that "[a]n issue may not be raised for the first time on appeal . . . where[, as here,] it 'could have been obviated or cured by factual showings or legal countersteps' in the trial court" (*Oram v Capone*, 206 AD2d 839, 840; *see Matter of Jared*, 225 AD2d 1049, 1049; *see generally Misicki v Caradonna*, 12 NY3d 511, 519; *Bingham v New York City Tr. Auth.*, 99 NY2d 355, 359). Moreover, appellate courts cannot and will not review an issue that has never been raised by the parties themselves. An exception to that rule is where a trial court or the Appellate Division determines, sua sponte, that it lacks subject matter jurisdiction (*see Matter of Fry v Village of Tarrytown*, 89 NY2d 714, 718). In this case, the dissent would decide this appeal on an issue objectants "never so much as hinted much less claimed before" the Surrogate or this Court (*Misicki*, 12 NY3d at 519 [emphasis omitted]).

> "For us now to decide this appeal on a distinct ground that we winkled out wholly on our own would pose an obvious problem of fair play. We are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made. In sum, [petitioner] deserves an opportunity to refute the proposition on which the dissent would decide this appeal against him" (*id.*).

As the Court of Appeals recognized in *Misicki*, "[w]hile appellate judges surely do not sit as automatons . . . , they are not freelance lawyers either. Our system depends in large part on adversary presentation; our role in that system is best accomplished when [we] determine[] legal issues . . . that have first been considered by . . . the trial . . . court" (*id.* [internal quotation marks omitted]). "In our view, it would be fundamentally unfair to determine this issue sua sponte and conclude, as does our dissenting colleague, that [petitioner] failed to meet [his] initial burden" of rebutting the presumption that the 1996 Will was revoked by destruction (*Woods v Design Ctr., LLC*, 42 AD3d 876, 878; *see e.g. Hann v Black*, 96 AD3d 1503, 1503-1504; *CB Richard Ellis, Buffalo, LLC v D.R. Watson Holdings, LLC*, 60 AD3d 1409, 1410). Indeed, to decide this appeal on issues never raised by the objectants would "implicate due process concerns" (*McHale v Anthony*, 41 AD3d 265, 267).

The dissent attempts to avoid the rules of preservation by contending that, regardless of preservation, "it was petitioner's burden, as proponent of the 1996 Will, 'to make the proofs essential to its admission to probate' " (quoting *Matter of Schillinger*, 231 App Div 679, 680, *affd* 258 NY 186). While we agree that petitioner had the initial burden of proof, we recognize that "[t]he preservation of an issue for appellate review is completely distinct from the question whether [a party] has sustained his [or her] burden of proof" (*People*

*v Duncan*, 177 AD2d 187, 192, *lv denied* 79 NY2d 1048).  We are mindful that *Duncan* involves an appeal from a judgment of conviction in a criminal case, but we conclude that the above principle is applicable to all appeals heard by this Court.

III

We now address those contentions raised by objectants on appeal. Although our dissenting colleague questions whether the ex-husband or his parents had possession of the 1996 Will, objectants contend that petitioner and his wife were the custodians of the 1996 Will and that they failed in their duty as custodians.  It is well settled that one who accepts custody of an original will is "bound to return the instrument to its maker upon demand and[,] . . . after the death of the testator and upon notice of such death, . . . [is] bound to produce the will so that it might be probated" (*Scholen v Guaranty Trust Co.*, 288 NY 249, 253-254; *see generally* SCPA 2507 [3]).  Here, as in *Scholen*, there is no evidence that petitioner or his wife "voluntarily assumed any greater obligation," and objectants "allege[] no facts which would permit the inference that from the bailment a broader duty ar[o]se[]" (*id.* at 254).

Even assuming, arguendo, that the ex-husband also could have been considered a custodian of the will, we conclude that neither the ex-husband nor his parents were under any legal obligation to return the 1996 Will to decedent at any time before her death inasmuch as it is undisputed that she never made a demand for its return (*see id.* at 253-254).  Although decedent's divorce decree required the ex-husband to return financial paperwork and any paperwork "needed to effectuate [the] division [of property]," the 1996 Will was not a document needed to effectuate the division of any property.  Moreover, petitioner and his wife were not parties to the divorce decree and thus were not subject to its provisions.

IV

Objectants further contend that the nomination of petitioner as alternate executor and alternate beneficiary must fail because such a nomination would fail under the law of Texas, and it would be inequitable to allow decedent's former father-in-law to be the sole beneficiary of her estate.  It is undisputed that the 1996 Will was a valid will and that the law of Texas, if applicable, would invalidate any testamentary distributions to petitioner (*see* Texas Probate Code § 69 [b]).  In New York, however, a divorce operates to revoke testamentary distributions to former spouses only (*see* EPTL 5-1.4 [a], [b]).  As objectants concede, New York law governs resolution of this case inasmuch as the real property is situated in this state and decedent was a domiciliary of this state at the time of her death (*see* EPTL 3-5.1 [b] [1], [2]; *see generally Matter of Good*, 304 NY 110, 115; *Matter of Strauss*, 75 Misc 2d 454, 456).  Pursuant to New York law, the testamentary distribution to the ex-husband and his appointment as executor are revoked, but all other provisions of the will remain valid (*see* EPTL 5-1.4 [a], [b]; *Matter of Coffed*, 59 AD2d 297, 300, *affd* 46 NY2d 514).

We reject the contention of objectants that we should ignore the clear and unambiguous wording of EPTL 5-1.4, as well as our own precedent, and decide this case on equitable principles. Indeed, we have previously held that the provisions of EPTL 5-1.4 apply only to former spouses, not to members of the former spouse's family (*see Coffed*, 59 AD2d at 300). Whereas *Coffed* involved a determination whether a former stepchild could inherit, and this case involves a former father-in-law, the statute does not permit us to distinguish between various members of the former spouse's family. If testamentary distributions to former stepchildren remain valid under the statute, we are constrained to conclude that testamentary distributions to other members of the former spouse's family also remain valid. We thus cannot rely on EPTL 5-1.4 to invalidate the testamentary distribution to petitioner; the clear and unambiguous language of the statute does not permit us to do so.

Contrary to the position of the dissent, such a result does not "circumvent the intent of the statute." Even if we could assume that the ex-husband might someday inherit or obtain the property from petitioner, we cannot decide petitioner's current legal rights to property based on our speculation of what he might do with that property in the future.

V

Finally, objectants contend that, although there is insufficient evidence to support admitting the Lost Will to probate (*see* SCPA 1407), there is sufficient evidence to establish that the Lost Will was duly executed, which thereby operates to revoke the 1996 Will. We reject that contention.

Pursuant to EPTL 3-4.1 (a) (1) (A) and (B), "[a] will or any part thereof may be revoked or altered by . . . [a]nother will[ or] [a] writing of the testator clearly indicating an intention to effect such revocation or alteration, *executed with the formalities prescribed . . . for the execution and attestation of a will*" (emphasis added). The only evidence at the hearing concerning the Lost Will was the testimony of decedent's former neighbor, whom the Surrogate found to be "a highly credible witness." Insofar as relevant to the issues on this appeal, the neighbor testified that, during the late summer or early fall of 2007, decedent received a package that she showed to the neighbor. The neighbor opened the package, which contained a cover letter from "an attorney's office" and a legal document entitled "Last Will and Testament." According to the neighbor, decedent had been working with a divorce attorney in Texas and had been traveling back and forth to Texas to finalize her divorce.

The neighbor testified that, in addition to revoking all prior wills and naming decedent's mother as the executrix, the legal document instructed that decedent's property would be left to her brothers, with a small stipend to a niece and nephew. The legal document was signed by decedent, and "[t]here were two witnesses' signatures." The neighbor could not recall the names of the witnesses, but testified that the document stated that they had

witnessed decedent's signature to the document.  There was a raised and embossed notary seal and a statement at the bottom of the third page indicating that the notary attested to the signing of the legal document.  Although the neighbor retained the legal document for a period of time, she returned it to decedent before moving away from the area.  It is undisputed that, despite a diligent search of decedent's residence, neither that document nor any other purported will was discovered.

Pursuant to EPTL 3-5.1 (c), a will disposing of real property situated in this state "is formally valid and admissible to probate in this state[] if it is in writing and signed by the testator, and otherwise executed and attested in accordance with the local law of . . . [t]his state; . . . [t]he jurisdiction in which the will was executed, at the time of execution; or . . . [t]he jurisdiction in which the testator was domiciled, either at the time of execution or of death."  Objectants contend that the evidence at the hearing was sufficient to establish that the Lost Will was duly executed and attested pursuant to EPTL 3-2.1.  We note, however, that the testimony at the hearing failed to establish whether the Lost Will was executed and attested in New York or Texas.  We therefore must consider the execution requirements for wills under the laws of both states.

In order for a will to be duly executed and attested in New York, the testator must sign the document at the end; the testator must sign or acknowledge the signature in the presence of the attesting witnesses; the testator must declare to each of the attesting witnesses that the instrument is his or her will; and there must be two attesting witnesses who shall, within 30 days, attest the testator's signature and, at the request of the testator, sign their names and affix their residence addresses (*see* EPTL 3-2.1 [a] [1] – [4]).  In order for a will to be duly executed in Texas, the will must be in writing, be signed by the testator, and be attested by two or more credible witnesses above the age of 14 who shall subscribe their names to the will in their own handwriting in the testator's presence (*see* Texas Probate Code § 59).

We are constrained to conclude that the evidence at the hearing is insufficient to establish that the Lost Will was duly executed and attested under the laws of either state.  With respect to New York's EPTL 3-2.1, there was no testimony that the document was signed or acknowledged by decedent in the presence of the witnesses.  Furthermore, there was no evidence that decedent declared to the witnesses that the document was her will.  Finally, although the neighbor testified that decedent's signature appeared on the document, there was no evidence that the signature was at the end of the document.  With respect to Texas Probate Code § 59, there was no evidence that the purported witnesses were over the age of 14 or that their signatures were in their own handwriting.

Although our dissenting colleague concludes that we may presume that the Lost Will was properly executed, we disagree with that conclusion.  There is no dispute that, "[*i]f* an attorney-drafter supervises the execution of a will, there is a presumption of

regularity that the will was properly executed" (*Matter of Halpern*, 76 AD3d 429, 431, *affd* 16 NY3d 777 [emphasis added]). Here, however, our dissenting colleague has made an assumption that an attorney in either New York or Texas drafted the Lost Will and supervised its execution. That assumption is based on the neighbor's testimony that the document mailed to decedent in the fall of 2007 "was accompanied by a cover letter from a law office." Although our dissenting colleague cites *Matter of Derrick* (88 AD3d 877, 879) and *Matter of Moskoff* (41 AD3d 481, 482) for the proposition that we may infer the Lost Will was prepared by an attorney because it was accompanied by a cover letter from an attorney's office, neither case supports that proposition. In both cases, the disputed will was actually before the Surrogate, and it was an established and undisputed fact that an attorney drafted those wills and supervised their execution.

As the First Department stated in *Halpern*, although "a valid attestation clause raises a presumption of a will's validity, . . . it is nonetheless incumbent upon Surrogate's Court to examine all of the circumstances surrounding the execution of the document in order to ascertain its validity" (*id.* at 431). Here, we are unable to examine any of the circumstances surrounding the execution and attestation of the Lost Will because we do not have the document or a copy thereof, we do not know where it may have been executed, we do not know who drafted it or who may have witnessed its execution, and it was not on file with a government agency (*cf. Derrick*, 88 AD3d at 878; *Halpern*, 76 AD3d at 430-431; *Moskoff*, 41 AD3d at 482; *Matter of Coniglio*, 242 AD2d 901, 902). We therefore decline to make a presumption based on an assumption.

Objectants contend in the alternative that, even if the evidence presented at the hearing failed to establish the elements of due execution and attestation, thereby precluding the Lost Will from being admitted to probate, the evidence, including evidence of decedent's intent, was sufficient in equity to establish that the 1996 Will was revoked. We reject that contention and respectfully disagree with the dissent's conclusion to the contrary. "With few exceptions not here relevant, the exclusive mechanism for revocation of a testamentary instrument is contained in EPTL 3-4.1. That section wisely requires that a revocatory instrument be executed with the same formalities as those needed to make a valid will. A less stringent provision would open the door to the dual evils of fraud and perjury" (*Coffed*, 46 NY2d at 519). Thus, if a document is not duly executed and attested in accordance with EPTL 3-2.1, then it cannot operate to revoke, pursuant to EPTL 3-4.1, a prior, duly executed and attested will.

We agree with the dissent that, even if the evidence concerning a subsequent will is insufficient to permit the subsequent will to be admitted to probate pursuant to SCPA 1407, that evidence may nevertheless be sufficient to establish that an earlier will was revoked (*see Matter of Wear*, 131 App Div 875, 876; *Matter of Shinn*, 7 Misc 2d 623, 624-625; *Matter of Henesey*, 1 Misc 2d 864, 868-869; *but see Matter of Logasa*, 161 Misc 774, 775-776; *see generally Matter of Goldsticker*, 192 NY 35, 37). The evidence concerning a subsequent will must establish, however, that it was duly executed and attested

before the subsequent will may be used to establish revocation of a prior will (*see e.g. Wear*, 131 App Div at 876; *Shinn*, 7 Misc 2d at 624; *Matter of Walsh*, 5 Misc 2d 801, 802-803; *Henesey*, 1 Misc 2d at 866; *Logasa*, 161 Misc at 775-776). The subsequent wills in *Wear, Shinn, Walsh* and *Henesey* were duly executed and attested, but they were not admitted to probate based on the fact that they had been lost and were presumed revoked (*see Wear*, 131 App Div at 876-877; *Shinn*, 7 Misc 2d at 624-625; *Walsh*, 5 Misc 2d at 802; *Henesey*, 1 Misc 2d at 868; *see generally* SCPA 1407 [1]; *Matter of Staiger*, 243 NY 468, 471-472; *Matter of Kennedy*, 167 NY 163, 168). In contrast, where the evidence fails to establish that a purported subsequent will was duly executed and attested, Surrogates have held that the evidence is insufficient to establish that the earlier will was revoked (*see Goldsticker*, 192 NY at 37; *Matter of Katz*, 78 Misc 2d 790, 791; *Matter of Andrews*, 195 Misc 421, 430-431; *Logasa*, 161 Misc at 776; *Matter of Kiltz*, 125 Misc 475, 479-480). Here, inasmuch as the evidence concerning the Lost Will is insufficient to establish that it was duly executed and attested, we conclude that the evidence is insufficient to establish that the 1996 Will was revoked.

## VI

With respect to the dissent's general considerations of equity and the power of the Surrogate to fashion equitable remedies, we note that, even if "[t]he equities in the instant case may appear to favor a different result, . . . a more significant consideration is that the formalities attendant upon the revocation of a will are necessary to prevent mistake, misapprehension and fraud" (*Coffed*, 59 AD2d at 300). Even if we may "surmise that [decedent] intended to change [her] will in accord with a natural desire to benefit [her relatives] exclusively[,] . . . it is not for the courts to circumvent the statutory requirements regarding the revocation of a will. Those provisions do not contemplate an implied revocation, but declare that revocation must be effected with the same formality with which a will is executed or by some act of mutilation or destruction" (*id.*).

## VII

Accordingly, because objectants failed to establish that the 1996 Will was revoked, we conclude that the decree in each appeal should be affirmed.

All concur except PERADOTTO, J., who dissents and votes to reverse the decrees in accordance with the following Opinion: I respectfully dissent. In my view, the record clearly establishes that decedent intended to, and did in fact, revoke her will dated July 15, 1996, both by execution of a subsequent testamentary instrument and by the presumption of physical destruction arising from the absence of the will among her personal possessions at the time of her death. I therefore conclude that the decrees should be reversed, probate of the will should be denied, the letters testamentary issued to petitioner should be revoked, and the amended letters of administration issued to decedent's parents should be reinstated.

I

The facts of this case are largely undisputed.  Decedent married James A. Simmons (ex-husband) in Texas in 1991.  In July 1996, decedent executed a last will and testament (1996 Will), in which she left all of her property to her ex-husband and, in the event that he predeceased her, to her ex-husband's father, James Robert Simmons, the petitioner herein.  Significantly, as noted in the Surrogate's decision, it is not clear from the record whether decedent executed four originals of the 1996 Will or one original and three copies.  When decedent executed the 1996 Will, she and the ex-husband owned a home together in Texas and had modest savings.  Decedent and the ex-husband thereafter purchased property in Clayton, New York (New York property) from decedent's mother and an uncle.  The property had been in decedent's family for several generations.

About 10 years later, decedent petitioned for divorce.  While the divorce was pending, she was hospitalized twice for grand mal seizures relating to alcohol abuse.  Doctors told decedent that, if she continued to drink, she would be dead within six months.  In April 2007, a Texas court granted decedent a divorce on the ground of insupportability, i.e., "that the marriage ha[d] become insupportable because of discord or conflict of personalities that destroys the legitimate ends of the marital relationship and prevents any reasonable expectation of reconciliation" (Texas Family Code § 6.001).  The ex-husband was awarded the marital residence in Texas and all of its contents with the exception of decedent's personal effects, and decedent was awarded the New York property.  Both parties were directed to "execute, sign and deliver to the other party *all property and/or paperwork* associated therewith for any items awarded to the other party . . . within ten days, including any deeds, releases, transfer of title, etc. as needed to effectuate this division" (emphasis added).

Decedent thereafter moved to the New York property and, on March 21, 2010, she died at age 43 from alcohol-related complications.  At the time of her death, decedent's only significant asset was the New York property, which was valued at approximately $200,000.  Despite a diligent and exhaustive search of the New York property, no will was found among decedent's personal effects.  As a result, in April 2010, decedent's parents, Meredith M. Stewart and Ronald L. Lewis, applied for and received letters of administration in Surrogate's Court.  They subsequently renounced their interest in the New York property in favor of decedent's brothers.

Approximately eight months after decedent died, the ex-husband learned of her death through an internet search.  Shortly thereafter, petitioner filed the 1996 Will in Surrogate's Court and petitioned for probate of that will and issuance of letters testamentary.  Petitioner alleged that, after the ex-husband learned of decedent's death, he advised petitioner that "*he had in his possession Decedent's original Last Will and Testament dated July 15, 1996*" (emphasis added).  Petitioner alleged that, because decedent's testamentary disposition with respect to the ex-husband had been revoked by operation of law

upon their divorce (*see* EPTL 5-1.4 [a]), he was entitled to decedent's entire estate as the sole remaining beneficiary of the 1996 Will.

Decedent's parents and brothers (collectively, objectants) objected to probate of the 1996 Will, contending, inter alia, that petitioner should be estopped from offering the 1996 Will for probate because, despite the provisions in the divorce decree requiring the ex-husband to turn over decedent's personal effects and associated paperwork, he "wrongfully and fraudulently deprived the decedent of the offered will and the opportunity to access and evaluate the instrument in the context of her divorce."

The Surrogate denied petitioner's request for preliminary letters testamentary, but amended the parents' letters of administration to prohibit the distribution of estate assets.  The Surrogate noted that if the 1996 Will had been "held by . . . [the] ex-husband, . . . [it] should have been returned to decedent."  The Surrogate further questioned whether "equity prohibit[s] the ex-husband and/or his father from possibly secreting or obtaining the Will via questionable means and then 'resurrecting' it by . . . bringing the Will to New York?"  Objectants subsequently filed supplemental objections, asserting that decedent executed a second will in 2007, thereby revoking the 1996 Will.  At the hearing, objectants presented the testimony of decedent's former neighbor, who testified that she and decedent became very close in 2005 when decedent and the ex-husband were having marital difficulties.  The ex-husband "occasionally berate[d] [decedent] in public" and, on one occasion, decedent appeared at the neighbor's home "covered in bruises."  The neighbor testified that she helped decedent with her finances, which were "very bleak."  Because decedent suffered from short-term memory loss, the neighbor helped decedent make lists of the things that she needed to do.  According to the neighbor, after the divorce was finalized, decedent's top priority was the preparation of a new will.  In the late summer or early fall of 2007, decedent gave the neighbor a large manila envelope, which had arrived via UPS.  The envelope contained a cover letter from an attorney's office and a legal document entitled "Last Will and Testament."  Decedent asked the neighbor to read the document, and they reviewed the terms together.

The neighbor testified that the first part of the document

> "revoked all previous wills and codicil[s].  This next part of it instructed to pay her debts.  The next paragraph was the Executrix who was her mother, Meredith.

> "And then the final part of it was that the river house [the New York property] go to her brothers, . . . and that a small stipend be given to her niece and nephew, . . . maybe five hundred dollars apiece, two hundred dollars apiece, something like that . . . I was struck by that because [decedent] didn't have two dimes to rub together at the time, but she loved those children."

The will was signed by decedent and two witnesses, both of whom indicated that they had witnessed decedent sign the document, and there was a raised and embossed notary seal and a notary statement at the end of the document.  At decedent's request, the neighbor stored the will in a file containing other papers belonging to decedent.  In August 2009, the neighbor moved from the area and returned to decedent all of her papers, including the will.  Finally, the neighbor testified that she was not aware of any contact between petitioner and decedent after the divorce.  By contrast, decedent had a close relationship with her father and brothers, who regularly visited her at the New York property.

A tenant who lived with decedent at the New York property from August 2006 until January 2008 testified that he never met petitioner and never heard decedent talk about him, and that he was not aware of any contact between the two.  He had met decedent's parents and brothers, however, and he testified that she "seemed to love them very much.  It was a very caring family."  Decedent's father and a tenant who lived with decedent from early 2008 until her death both testified that they searched the New York property after decedent's death, but did not find any will.

The main witness on behalf of petitioner was decedent's former mother-in-law (Mrs. Simmons), who testified that, on July 15, 1996, decedent gave her "the" original 1996 Will and "asked [her] to keep it in a safe place."  Mrs. Simmons placed the will "in a dresser drawer and showed [decedent] where [she] put it, so that [decedent] could retrieve it at any time she wished."  Thereafter, decedent never asked for the will and Mrs. Simmons never considered returning it to her.  According to Mrs. Simmons, the will remained in her dresser until she learned of decedent's death in late November 2010.  At that point, she "knew [she] had the Will and [she] said we have got to read the Will and see what it says."  When she opened the will, she was "shocked" to learn that petitioner was named therein.  Within a few days, the ex-husband "got on the phone . . . to try to locate a lawyer."  Neither Mrs. Simmons nor the ex-husband notified decedent's family of the existence of the will.

The ex-husband testified that, in 1996, he and decedent executed mirror wills, i.e., he left all of his property to decedent and decedent left all of her property to him.  At the same time, they each also executed a power of attorney and a health care proxy.  According to the ex-husband, they had "four copies of [each of the] six different documents done all on the same day," and they planned to keep one set at their Texas home, another set at the New York property, another set at his parents' house, and the final set in a safe deposit box.  The ex-husband testified that they had "four sets of everything at each house for a reason," i.e., "[w]e both traveled. We knew that one house could burn down."  According to the ex-husband, it was not until "the day we dug them out or my mom discovered them after we found out [decedent] had died" that they learned that Mrs. Simmons had "the" original 1996 Will.  Like Mrs. Simmons, the ex-husband testified that he was "shocked" that petitioner was decedent's alternate beneficiary.  The ex-husband admitted, however, that, after

the divorce, he found "[o]ne of [the] four copies" of the 1996 Will "in some remaining paperwork" at the Texas property.

Finally, petitioner briefly testified that he was "not the Petitioner," and that he was "just along for the ride."

In its decree dated May 18, 2012, the Surrogate found that the neighbor "was a highly credible witness," and wrote that he "ha[d] no doubt that her testimony was accurate and that she saw what she described." The Surrogate concluded, however, that, "while the testimony of what [the neighbor] saw establishe[d] all the components required to be in [a] last will and testament, it cannot establish due execution as required under EPTL[] 3.2-1" because the neighbor did not witness the execution ceremony and the attesting witnesses were unknown. The Surrogate recognized that "the distribution pursuant to the will being offered for probate by the petitioner [wa]s drastically different than what an intestate distribution would be," and that "the fact that the will was drafted [10] years prior to the decedent's divorce raises suspicion in [objectants'] eyes as to whether the [1996 Will] truly reflect[ed] what the decedent would have wanted when she passed in 2010." The Surrogate concluded, however, that he was "bound by the existing body of law in New York," and that he could not "set aside a duly proven will just because the testamentary disposition therein is different than what would be expected." The Surrogate therefore dismissed the objections, revoked the amended letters of administration, and admitted the 1996 Will to probate.

Objectants appeal.

II

> "It is . . . clear that a paper once duly executed
> as a will, but which has been expressly revoked by
> the testator, or which is presumed to have been
> revoked by the happening of those facts which the
> law declares shall raise a presumption of
> revocation, ought not to be admitted to probate.
> The question of revocation touches the
> testamentary intent[,] and it is the duty of the
> [S]urrogate to investigate the question of
> testamentary intent and to hear all legal proof
> that may be germane to that question" (*Matter of
> Davis*, 45 Misc 554, 557, *affd* 105 App Div 221,
> *affd* 182 NY 468).

In this case, the only direct testimony of decedent's postdivorce intent, which was expressly credited by the Surrogate, establishes that decedent intended to revoke the 1996 Will and to prepare a new instrument devising the New York property, her only significant asset, to her blood relatives. The only question, therefore, is whether decedent in fact revoked the 1996 Will in accordance with her undisputed intent.

A will may be revoked by "[a]nother will" or by "[a]n act of

burning, tearing, cutting, cancellation, obliteration, or other mutilation or destruction performed by . . . [t]he testator" (EPTL 3-4.1 [a] [1] [A]; [2] [A] [i]).  It is well established that, "[i]f a will, shown once to have existed and to have been in the testator's possession, cannot be found after the testator's death, the legal presumption is that the testator destroyed the will with the intention of revoking it" (*Matter of Demetriou*, 48 AD3d 463, 464; *see Matter of Staiger*, 243 NY 468, 472; *Matter of Kennedy*, 167 NY 163, 168-169; *Collyer v Collyer*, 110 NY 481, 486).  The presumption of revocation by physical destruction is "strong" and "stands in the place of positive proof" that the testator in fact destroyed his or her will with revocatory intent (*Staiger*, 243 NY at 472; *see Matter of Sharp*, 134 Misc 405, 406, 407-408, *affd* 230 App Div 730; *Matter of Barnes*, 70 App Div 523, 525; *Matter of Huang*, 11 Misc 3d 325, 326).  The burden of overcoming that presumption is borne by the petitioner, who must establish that the will was not revoked by the testator during the testator's lifetime (*see Demetriou*, 48 AD3d at 464; *Matter of Gray*, 143 AD2d 751, 751-752, *lv denied* 74 NY2d 607; *Barnes*, 70 App Div at 524-525; *Matter of Ascheim*, 75 Misc 434, 435).

Moreover, where multiple copies of a will are executed, "revocation of one is a revocation of all" (*Matter of Betts*, 200 Misc 633, 634-635; *see Crossman v Crossman*, 95 NY 145, 150; *Matter of Robinson*, 257 App Div 405, 406-407; *Matter of Hedin*, 181 Misc 730, 731).  As the Court of Appeals has explained, "[w]here a will is executed in duplicates a revocation of one according to law *animo revocandi* is a revocation of both.  As each contains the will of the testator, a revocation of either is a revocation of his [or her] will, and thus revokes both" (*Crossman*, 95 NY at 150; *see Matter of Konner*, 101 NYS2d 651, 652 ["The revocation of one of several counterparts of a will constitutes a revocation of the will"]).  Thus, the proponent of a will executed in multiples must "produce or satisfactorily account" for each counterpart (*Matter of Rinder*, 196 Misc 657, 659; *see Robinson*, 257 App Div at 407; *Matter of Jacobstein*, 253 App Div 458, 461; *Matter of Sibley*, 8 Misc 2d 533, 534).  Where one of the copies of the will is missing, the presumption is that "the testator destroyed such executed copy, *animo revocandi*, and thus revoked his [or her] entire will, *particularly when it is shown that the copy unaccounted for was in [the] deceased's possession*" (*Rinder*, 196 Misc at 659 [emphasis added]; *see Sibley*, 8 Misc 2d at 534; *Matter of Schofield*, 72 Misc 281, 285-286).

Here, the ex-husband testified with respect to the execution of the 1996 Will that he and decedent "had four copies of six different documents done all the same day, four of her will, four of [his] will," four power of attorney forms, and four health care proxies.  He and decedent planned "to leave one set [of each of the six documents] at [the ex-husband's] parents' house, one set at [their] Texas house, one set at the New York house and one set in a safe deposit box."  According to the ex-husband, "[t]hat was all planned out before we sat down that day and . . . *signed all those signatures*" (emphasis added).  He and decedent "had four sets of everything" because, among other reasons, they both traveled frequently and "one house could burn

down."

        Upon decedent's death, however, only one of the four copies of
the 1996 Will was produced—the one possessed by petitioner, the sole
remaining beneficiary under the will.  Despite an exhaustive search,
no will was found in decedent's New York home or among her personal
effects.  As the Surrogate noted in his decision, it is not clear from
the record whether "decedent and [the ex-husband] left the attorney's
office with four original instruments or one original and three
copies."  In my view, that factual uncertainty is fatal to the
petition for probate of the 1996 Will.  As this Court stated many
decades ago,

> "[t]he authorities are uniform in holding that
> when it appears . . . that a will was executed in
> duplicate, one paper cannot be probated without
> producing the other or accounting for its non-
> production, the theory being that *[a] testator can
> destroy his [or her] will by destroying the one in
> his [or her] possession without repossessing and
> destroying its duplicate*" (*Robinson*, 257 App Div
> at 407 [emphasis added]; *see Jacobstein*, 253 App
> Div at 461; *Matter of Flanagan*, 38 NYS2d 696, 697–
> 698; *Schofield*, 72 Misc at 285-286).

Based upon the trial testimony and common sense, it is far more likely
that decedent executed four original instruments, and any doubts
relative thereto should be resolved against petitioner as proponent of
the 1996 Will.  Mrs. Simmons testified that decedent was "very
meticulous about records" and that she "kept records of everything,"
yet she claimed that, out of the four locations decedent and her ex-
husband selected to store their wills—the Texas house, the New York
property, the ex-husband's parents' house, and a safe deposit box—they
decided to entrust Mrs. Simmons with the *only* original, which she
placed in a dresser drawer.

        Those circumstances are even more suspect in light of the
differing accounts of how the 1996 Will ended up in petitioner's
possession.  The verified petition alleges that, at the time of
decedent's death, *the ex-husband* "had in his possession [d]ecedent's
original Last Will and Testament dated July 15, 1996."  Objectants
thereafter asserted that petitioner should be estopped from offering
the 1996 Will for probate because the ex-husband withheld it in
violation of the divorce decree.  After the Surrogate issued a
decision stating that if the 1996 Will had been "held by . . . [the]
ex-husband, . . . [it] should have been returned to decedent,"
petitioner's counsel then advised the court that it was actually
petitioner, not the ex-husband, who possessed decedent's original 1996
Will at the time of her death.  According to counsel, she "was told .
. . that[,] after [decedent] signed the will, . . . the original was
delivered to [petitioner] for safekeeping because [decedent] and [the
ex-]husband traveled a lot.  And they put a copy in their house in
Texas and a copy in their house in New York after they purchased the
New York house and there it sat."  Petitioner's counsel told the

Surrogate that she did not "know why the will was not found after [decedent] died in her home . . . *I don't know why <u>even an original wasn't found after [decedent] died</u>*.  It was in her - - in the safe in her house with her abstract of title" (emphasis and additional emphasis added).  At trial, petitioner adhered to his statement in the petition that the ex-husband possessed the original 1996 Will at the time of decedent's death.  The ex-husband admitted that he possessed "[o]ne of four copies" of the 1996 Will, which he claimed he found after the parties' divorce among "some remaining paperwork" in the Texas house.  He did not return the will to decedent, however, despite the directives in the divorce decree that he return to decedent any of her "personal effects" in his possession or in the Texas house, and that he "deliver to [decedent] all property and/or paperwork associated therewith for any items awarded to [her]."

Significantly, the ex-husband never produced his copy of the 1996 Will, and the Surrogate did not direct him to do so.  In my view, that was error (*see Crossman*, 95 NY at 152 ["As soon as it is brought to the attention of the (S)urrogate that there are duplicates of a will presented to him (or her) for probate, it is proper that he (or she) should require both duplicates to be presented, not for the purpose of admitting both as separate instruments to probate, but that (the Surrogate) may be assured whether the will has been revoked, and whether each completely contains the will of the testator"]; *Matter of McChesney*, 118 Misc 545, 546 ["(I)t is undoubtedly the duty of the court to require the production of the missing duplicate in order that the court may inspect both duplicates so that it may be seen whether or not they are precisely alike and whether or not there has been any revocation"]).  Where, as here, the only copies of the 1996 Will that petitioner produced or accounted for were in the exclusive custody and control of his wife and son, and petitioner failed to produce or account for the two remaining copies, at least one of which was in decedent's possession prior to her death, "we must apply the established presumption 'that a will proved to have had existence and not found at the death of [the] testator was destroyed *animo revocandi*' " (*Schofield*, 72 Misc at 286, quoting *Knapp v Knapp*, 10 NY 273, 278; *see Matter of McGuigan*, 10 Misc 2d 865, 866 ["The proponent's failure to explain the inability to produce both or all copies of a will executed in multiplicate one of which was shown to have been in the possession of decedent raises the presumption that the will was revoked by decedent"]).  Here, as in *Schofield*,

> "it [was] established that [decedent] did not have possession of [all] examples or duplicates [of the will] . . . [T]he authentic or the example actually produced for probate was not in [her] custody in [her] lifetime, and *no presumption . . . is to be drawn from the passive conduct of the testator in respect of that example.*  [She] may have been of the opinion that its destruction was not necessary to a revocation, or, as [petitioner was] named in the duplicate as [sole] legatee[], [s]he may not have desired [him] to know of the

revocation. What [her] thoughts were we do not know and cannot consequently consider" (72 Misc at 285 [emphasis added]; *see Hedin*, 181 Misc at 731 ["Where it is shown, as here, that the decedent had possession of the counterparts and the proponent cannot satisfactorily explain the nonproduction of all such, the presumption of revocation by destruction is operative"]).

Accordingly, I conclude that probate of the 1996 Will should be denied (*see Matter of Funk*, 139 NYS2d 225, 228-229 ["Since proponent has wholly failed to explain or account for the non-production of the executed counterpart retained by testatrix, the court has no alternative other than to deny probate"]; *see also Robinson*, 257 App Div at 407-408; *Sibley*, 8 Misc 2d at 534-535; *Hedin*, 181 Misc at 731; *Matter of Branagan*, 180 Misc 209, 210-211; *McChesney*, 118 Misc at 546-547; *Schofield*, 72 Misc at 285-286).

I note that, although the majority attempts to cast this critical issue as one of preservation or lack thereof on the part of objectants, it was petitioner's burden, as proponent of the 1996 Will, "to make the proofs essential to its admission to probate" (*Matter of Schillinger*, 231 App Div 679, 680, *affd* 258 NY 186; *see Matter of Andriola*, 160 Misc 775, 778-790). Where, as here, the testimony of *petitioner's own witnesses* raised a question of fact whether the will produced for probate was *the* original will, or one of several wills unproduced and unaccounted for, petitioner failed to meet that burden (*see Jacobstein*, 253 App Div at 461 ["(I)f, as claimed here, the propounded instrument was executed in triplicate, the burden was cast upon the proponent to produce the face copy retained by the decedent more than twenty years ago, or—failing to do so—to account in such a manner for its (nonproduction) as to negative the inference of revocation"]). If the majority believes that it would be "fundamentally unfair" to decide this issue on appeal, as they assert, then we should remit the matter to Surrogate's Court to make a determination whether the 1996 Will was executed in multiples (*see Matter of Burtis*, 107 App Div 51, 52 ["(I)f upon appeal it appears that the disposition of the questions of fact raised by the evidence is not free from doubt and the (S)urrogate's decision is not entirely satisfactory, the questions of fact will be sent to a jury for determination"]; *see also Howland v Taylor*, 53 NY 627, 628; *Matter of Lawson*, 75 AD2d 20, 29-30). If the Surrogate so determines, then petitioner must produce or account for the three other copies of the 1996 Will before the offered copy may be admitted to probate (*see Crossman*, 95 NY at 152; *Robinson*, 257 App Div at 407).

III

Over and above the legal presumption that decedent destroyed the 1996 Will with the intention of revoking it (*see Staiger*, 243 NY at 472; *Collyer*, 110 NY at 486; *Demetriou*, 48 AD3d at 464), there is direct evidence in this case of decedent's revocatory intent and conduct. Decedent's neighbor, whom the Surrogate found to be "highly

credible," testified without contradiction that decedent intended to, and did in fact, revoke the 1996 Will by executing a new will devising her estate to her brothers (*see* EPTL 3-4.1 [a] [1] [A]). The neighbor testified that, after decedent's divorce was finalized, her highest priority was to execute a new will. To that end, in the late summer or early fall of 2007, decedent gave the neighbor a large manila envelope containing a cover letter from an attorney's office and a legal document entitled "Last Will and Testament." The document had been signed by decedent and two witnesses, both of whom indicated that decedent had signed the will in their presence, and contained a raised notary seal and a notary statement. Decedent asked the neighbor to read the will, and they reviewed the terms together. This later will "revoked all previous wills and codicil[s]," named decedent's mother as executrix of her estate, devised the New York property to her brothers, and left a small stipend to her niece and nephew. The Surrogate stated that he had "no doubt that [the neighbor's] testimony was accurate and that she saw what she described." Unfortunately, this later will could not be located after decedent's death, and the neighbor did not recall the names of the subscribing witnesses or the attorney who prepared the will (hereafter, Lost Will). The Surrogate thus concluded that, "while the testimony of what [the neighbor] saw establishes all of the components required to be in [a] last will and testament, it cannot establish due execution as required under EPTL[] 3.2-1."

It is not clear whether the Lost Will was executed in Texas or in New York, although the record suggests that it was executed in Texas. Under Texas law, "a will is valid if it is (1) in writing, (2) signed by the testator, and (3) attested by two or more credible witnesses above the age of fourteen years, who write their signatures in the testator's presence" (*Matter of Arrington*, 365 SW3d 463, 467 [Tex App, 1st Dist 2012]; *see* Texas Probate Code § 59). In order for a will to be duly executed in New York, the testator must sign the document at the end, sign or acknowledge his or her signature in the presence of at least two witnesses, and declare to each of the witnesses that the instrument is his or her will (*see* EPTL 3-2.1 [a] [1] - [3]). Further, the witnesses must, within 30 days, attest the testator's signature and, at the request of the testator, sign their names and affix their addresses (*see* EPTL 3-2.1 [a] [4]).

I agree with the Surrogate and the majority that the neighbor's testimony, by itself, is insufficient to establish due execution of the Lost Will under New York law. Although the neighbor testified that the instrument was signed by decedent and two witnesses, both of whom indicated that they had witnessed decedent sign the will, she did not testify that decedent declared that the instrument was her will or that decedent's signature appeared at the end of the instrument. It is well established, however, that, "[i]f an attorney-drafter supervises the execution of a will, there is a presumption of regularity that the will was properly executed" (*Matter of Halpern*, 76 AD3d 429, 431, *affd* 16 NY3d 777; *see Matter of Coniglio*, 242 AD2d 901, 902). Here, the neighbor testified that the Lost Will was accompanied by a cover letter from an attorney's office, that it was written in "legalese," and that it contained the signature of a notary

"attest[ing] to the signing of the Will" and a raised, embossed notary seal.  She further testified that, during the period at issue, decedent periodically traveled back and forth to Texas to consult with an attorney in connection with her divorce.  Based on those facts and the attendant circumstances, it may reasonably be inferred that the Lost Will was prepared by an attorney, thereby giving rise to the "presumption of proper execution" (*Matter of Derrick*, 88 AD3d 877, 879; *see Matter of Moskoff*, 41 AD3d 481, 482).  Further, in my view, the neighbor's testimony was sufficient to establish the validity of the Lost Will under Texas law inasmuch as she testified that (1) the instrument was in writing, (2) it was signed by decedent, and (3) it was attested by two witnesses (*see* Texas Probate Code § 59; *Arrington*, 365 SW3d at 467).  Although the majority correctly notes that we do not know whether the two witnesses were over the age of 14 (*see* Texas Probate Code § 59), "there is a presumption of regularity that the will was properly executed in all respects" based upon its preparation by an attorney (*Matter of Spinello*, 291 AD2d 406, 407).

Even assuming, arguendo, that objectants have not proven due execution of the Lost Will, I conclude that the neighbor's testimony is sufficient to establish decedent's revocation of the 1996 Will.  SCPA 1407 provides that "[a] lost or destroyed will *may be admitted to probate* only if, [inter alia,] . . . [e]xecution of the will is proved in the manner required for the probate of an existing will" (emphasis added).  Here, objectants do not seek to "admit[] to probate" the Lost Will (SCPA 1407).  Rather, they seek to establish that decedent revoked the 1996 Will by execution of a subsequent testamentary instrument.  We note that it is well settled that "[a] later instrument may effect a revocation of an earlier will although inoperative in other respects" (*Matter of Shinn*, 7 Misc 2d 623, 624; *see Matter of Goldsticker*, 192 NY 35, 37 ["It is doubtless true that under certain circumstances an instrument may be effective as a revocation of previous wills, and yet fail as a will itself"]; *see also Matter of Rokofsky*, 111 NYS2d 553, 557).  As the Second Department reasoned in *Matter of Wear* (131 App Div 875, 876-877),

> "it is one thing to admit to probate a will disposing of a [person]'s estate where the will cannot be found, and quite another thing to merely establish that a second will, revoking a former will, has been duly made and executed and left in the possession of the decedent.  In the one case we are assuming to dispose of property in a manner different from that prescribed by law in the absence of a will, while in the latter case we are merely permitting the property to descend in the manner which the law designates."

Here, in light of the uncontradicted testimony of decedent's intent to revoke the 1996 Will and her execution of a document effectuating that intent, I would hold that the Lost Will operated to revoke the 1996 Will.  I would therefore deny probate of the 1996 Will and permit the estate to pass through intestacy (*see generally Matter of Hughson*, 97 Misc 2d 427, 429 ["(I)t is the court's obligation to .

. . carry out, within the realm of possibility, the intent of the deceased under the circumstances"]; *Matter of Neill*, 177 Misc 534, 536 ["In this type of case as in all other questions of construction the intention of the testator is paramount and supersedes all presumptions and general rules"]).  As the majority notes, the overriding purpose of the statutory due execution requirements is "to prevent the probate of fraudulent instruments" (*Matter of Litwack*, 13 Misc 3d 1011, 1013; *see Matter of Kleefeld*, 55 NY2d 253, 259, *rearg denied* 56 NY2d 683, 805).  Here, objectants do not seek to probate the Lost Will and there is no suggestion of fraud on their part or on the part of the neighbor, the only disinterested witness to testify at the hearing.  I thus conclude that giving effect to the revocatory language of the Lost Will would not frustrate the "fraud-preventing purposes" of the statute (*Litwack*, 13 Misc 3d at 1013).

IV

Finally, I cannot agree with the majority that this Court is "constrained" to conclude as they do.  It is well established that "[t]he Surrogate's Court is a court of equity" (*Matter of Dell*, 154 Misc 216, 219), with "the broadest possible equitable powers" in relation to the subject matter entrusted to its jurisdiction (*Matter of McCafferty*, 147 Misc 179, 201; *see* NY Const, art VI, § 12 [e]; *Matter of Stortecky v Mazzone*, 85 NY2d 518, 523-524; *Matter of Stuart*, 261 AD2d 550, 550; *Matter of Abraham L.*, 53 AD2d 669, 670; *Matter of Beall*, 184 Misc 881, 883-884).  SCPA 201 provides that Surrogate's Court

> "shall continue to exercise full and complete general jurisdiction in law and in equity to administer justice in all matters relating to estates and the affairs of decedents, and . . . to try and determine all questions, *legal or equitable*, arising between any or all of the parties to any action or proceeding . . . in order to make a full, equitable and complete disposition of the matter by such order or decree as justice requires" (SCPA 201 [3] [emphasis added]).

As one court wrote, "[m]ore comprehensive language could not have been found" (*Beall*, 184 Misc at 883-884) and, "[o]nce equity is invoked, the court's power is as broad as equity and justice require . . . [T]he court sitting in equity looks to the substance and to the merits of a transaction, rather than to its form" (*Norstar Bank v Morabito*, 201 AD2d 545, 546).  "[A]s one cannot foresee the myriad of circumstances which might arise in the future, it is quite necessary that '[e]quity will administer such relief as the exigencies of the case demand' " (*Beall*, 184 Misc at 884, quoting *Bloomquist v Farson*, 222 NY 375, 380).

In this case, the equities overwhelmingly favor denying probate of the 1996 Will and permitting decedent's estate to pass through intestacy (*see* SCPA 201 [3]; *see generally Latham v Father Divine*, 299

NY 22, 27, *rearg denied* 299 NY 599 ["Nothing short of true and complete justice satisfies equity"]). As both parties acknowledge, decedent's estate primarily consists of the New York property, which has been in her family for several generations. At the time that decedent executed the 1996 Will, she did not own the New York property. Decedent and the ex-husband thereafter purchased the New York property from decedent's mother and, when the parties divorced in 2007, decedent was awarded the New York property as her sole and separate property.

After the divorce, there was little, if any, contact between decedent and her former in-laws. Decedent's neighbor testified that she was not aware of any contact between decedent and petitioner after the divorce, and one of decedent's tenants likewise testified that he never met petitioner, had never heard decedent talk about him, and was not aware of any communication between the two. By contrast, the neighbor testified that decedent was very close to her father and brothers, who were "frequent visitors" to the New York property. The tenant met decedent's parents and brothers when he lived with her, and he testified that "[s]he seemed to love them very much. It was a very caring family." Although Mrs. Simmons claimed that decedent and petitioner were "very close," she admitted that the two had no contact after the divorce. Indeed, the ex-husband's family did not learn of decedent's passing until approximately eight months after her death, when the ex-husband "decided to Google [decedent's] name and see if he - - what came up and her obituary came up." Within a few days, the ex-husband's family had retrieved the 1996 Will and had consulted estate attorneys in New York and Texas. They did not contact decedent's family, however, to express their condolences or to advise them of the purported "discovery" of the 1996 Will.

In my view, the testimony of Mrs. Simmons and the ex-husband to the effect that they had forgotten that the 1996 Will left everything to the ex-husband or, in the event that he predeceased decedent, to petitioner, and that they were "shocked" to discover that petitioner was the sole beneficiary of decedent's estate is simply incredible. Indeed, the ex-husband testified that he and decedent executed mirror wills in 1996, and he insisted at trial that it was decedent's "choice" to select petitioner as the alternate beneficiary. It is thus disingenuous, at best, for him to claim that he was unaware of the contents of the 1996 Will. Rather, the record suggests that the ex-husband's family was fully aware that they possessed an original and at least one copy of the 1996 Will and that, despite the divorce, decedent's relocation to New York, and their knowledge that her health was failing, they made no effort to return the will to its rightful owner, but instead retained possession of the will and resurrected it as soon as they learned of her untimely demise.

It is troubling that it seems apparent from the record that the real party in interest here is the ex-husband, who is legally barred from taking under his former spouse's will (*see* EPTL 5-1.4 [a]; *Matter of Cullen*, 174 Misc 2d 236, 237 ["The divorce of a testator and the former spouse, subsequent to a will's execution, revokes any bequest to or appointment of the former spouse"]). It was the ex-husband who,

shortly after learning of decedent's death, attempted to find a lawyer and, indeed, counsel for petitioner acknowledged that the ex-husband brought the will to her office. Petitioner testified at trial that he was "not the [p]etitioner" and that he was "just along for the ride," suggesting that he is the petitioner in name only and that the true party in interest is the ex-husband. Thus, in my view, enforcing the predivorce testamentary disposition and appointment with respect to petitioner would circumvent the intent of the statute by permitting the ex-husband to obtain indirectly from petitioner through inter vivos gift, testamentary bequest, or intestacy (*see* EPTL 4-1.1 [a] [1], [3]), what he could not lawfully obtain directly (*see* EPTL 5-1.4 [a]; *see generally Riggs v Palmer*, 115 NY 506, 510 [" 'By an equitable construction, a case not within the letter of a statute is sometimes holden to be within the meaning, because it is within the mischief for which a remedy is provided' "]).

V

In sum, I conclude that objectants established that decedent intended to revoke the 1996 Will and that she did in fact revoke that will by operation of the presumption of revocation through destruction and by her subsequent execution of a new testamentary instrument (*see Matter of Williams*, 121 Misc 243, 246-247). I further conclude that admitting the 1996 Will to probate is manifestly unjust and inequitable under the unique circumstances of this case inasmuch as it would defeat the purpose and spirit of EPTL 5-1.4 and contravene decedent's clear and unequivocal intent to revoke the 1996 Will and to leave her limited estate to her own family.

Accordingly, I conclude that the objections should be sustained, probate of the 1996 Will should be denied, the letters testamentary issued to petitioner should be revoked, and the amended letters of administration issued to decedent's parents should be reinstated.

Entered:  January 3, 2014                        Frances E. Cafarell
                                                 Clerk of the Court